[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION OF THE COURT
BEFORE:
Appearances:
For the plaintiff: ROSEMARY GIULIANO, ESQUIRE 39 Sherman Hill Rd. Woodbury, CT 06798
For the defendant:
 JEFFREY GINZBERG, ESQUIRE 11 Bank Street — P.O. Box 1 Seymour, CT 06483-0001
For the children:
 MICHAEL CONWAY, ESQUIRE 100 Grand Street Waterbury, CT 06724
For the children, Guardian Ad Litem:
 THOMAS PETTINICCHI, ESQUIRE P.O. Box 4898 Waterbury, CT 06704-4898
Recorded by: Transribed by: William Parsons Patricia Lux Court Recording Monitor Court Recording Monitor One Court Street One Court Street Middletown, CT 06457 Middletown, CT 06457
(There are prior proceedings of record not transcribed. The following is the decision of the court.)
THE COURT: The court finds it has jurisdiction over the marriage, one party has resided in the state of Connecticut continuously for more than one year prior to the bringing of this action.
There have been four minor children born to the plaintiff wife since the date of the marriage who are issue of the marriage and they are Thomas, Jr. who was born July 20th, 1986; Janine who was born November 5, 1988; Marie who was born February 21, 1991; and Joseph who was born April 29th, 1992. CT Page 5085-iw
There are no other minor children born issue of the marriage; no other minor children have been born to the wife since the date of the marriage and the plaintiff wife is not currently pregnant.
The parties have not been recipients of public assistance.
For reasons stated hereinafter and probably really best known to the parties this court does find that the marriage between the parties has broken down irretrievably and there is no reasonable hope of its reconciliation And, therefore, lest I forget to order it at the end, among the other orders the court does order a dissolution of the marriage. I have forgotten to say that at the end and that's why I put it in now.
The court has before it a circumstance in which the plaintiff wife, Mrs. Christolini, whose birth name was Lockhart, is forty-one years old, she has a high school education and this is her first marriage and except for the circumstances described hereinafter she's generally been in good health.
The defendant husband has an associate's degree from college, he was born in 1951, he's forty-eight and just under forty-nine years old, which he will arrive at on May 1, he is in good physical health.
The court has carefully considered the statutory criteria in this decision concerning issues affecting the dissolution of marriage, custody, visitation, parenting access issues of minor children, child support, health insurance, health expenditures, life insurance, alimony and property settlement, more properly known as an assignment of the respective interests in the marital estate, as well as counsel fees for the parent parties and counsel fees and guardian ad litem fees for the minor children.
The court finds further the following facts. Except for the following the court has indicated the plaintiff wife is in good physical health. She has, however, suffered from two health disabilities; the first one, perhaps the more enduring, is a condition affecting her right eye, starting as a form of glaucoma which is an unyielding pressure on the eye that is not relieved under normal circumstances. It has in the last two years resulted in her having five surgeries, some planned and some emergency. She remains convalescing from the last surgery for approximately ninety days at this point and continues to have discomfort and sight problems in the eye. She is at risk for future surgeries CT Page 5085-ix including a corneal transplant.
The evidence does not suggest at the present time that the disabilities resulting from the conditions to her eye have or will result in her unemployment. Presently she is out of work on disability and collecting her full regular time pay. No evidence has suggested that that will end any time soon or, in any case, in a shorter period of time than it's necessary for her to collect it.
Her only other time she's been out on disability is for the other health disability she has suffered and that is depression, which will be discussed more fully hereinafter but, briefly, from a health perspective, somewhere around 1993 and thereafter the plaintiff experienced a depression including dizziness, lethargy, lack of concentration, fatigue which resulted in her being out of work and receiving disability until she was fully employed in the late summer or early fall of 1994. It has not, from that time to the present day five and a half years later, been a cause of any loss of employment thereafter and, therefore, the court finds that through self-management and occasional medication the plaintiff has been able to regulate the depressive condition and it has not affected her earning capacity.
Throughout this marriage both of these parties have been hard workers. Their employment at the time of the marriage was in Danbury. Mr. Christolini continues to have a commuting job as he described approximately thirty-five minutes in each direction. Ms. Christolini was fortunate to be able to have her job transferred to Waterbury, which is substantially closer to the family home where the parties have been residing in Watertown. Both parties have experienced periodic pay increases throughout the time of the marriage. Both have, consistent with their employment availability and the family needs, from time-to-time worked overtime throughout the marriage.
There is nothing in the evidence to suggest from a financial point of view that either party has failed to contribute in any way within their own means and available resources to the marriage of the parties.
The earning capacity of the parties, frankly, is difficulty to discern. The court notes that Mr. Christolini has worked steady overtime until April of 1998. His earnings, including overtime, in 1995 were sixty-six thousand tour fifty-eight; sixty-seven thousand two eighty-five in `96; seventy-nine thousand four eighty-eight in 1997; fifty-nine thousand one fifteen in 1998 with the overtime ending on or about the first week of April. His sustained earnings now without overtime, based CT Page 5085-iy upon a rate increase that brought him from eight eighty a week to nine thirty a week are now forty-eight thousand three hundred and sixty dollars per year on an annualized basis.
The court does not find Mr. Christolini credible in his assertion that the overtime ended on the same week that he was served with papers merely because a project had ended. However, we're two years later and the evidence fails to suggest whether or not the overtime that was previously available to him five years ago, four years ago, three years ago, two and a half years ago is presently available at the present time. His testimony that Raytheon has taken over the company and has changed the policy overtime is credible. Somewhere between that change of policy and his decision, which the court finds he did exercise his decision to stop working overtime, is an indication of whether or not he can work overtime but that somewhere in between evidence was not presented to the court and, therefore, the court cannot discern and find that overtime is presently available to Mr. Christolini although it may have been available two years ago; too much time has passed.
Ms. Christolini has also worked her share, far more limited, of overtime and it's reflected in her earning capacity as evidenced by her wages. In 1995 her total wages were thirty-nine thousand two hundred and eighteen dollars; forty-one thousand six twenty-six in `96; thirty-nine two fourteen in `97; as best as can be discerned, thirty-six thousand eight forty-nine in 1998 and thirty-five thousand nine eighty-four as best can be discerned in 1999 and the court indicates that as a result of the evidence that the court had a little colloquy with counsel about yesterday. Presently she's clearly not earning overtime because she's out on medical disability. It would appear that as overtime is available to her from time to time on a basis through her employment at SNET, however, she has always tempered that taking of overtime with meeting the scheduled needs that the parties have provided for for the children.
Presently, given her health disabilities, the court cannot find that overtime is presently available to increase her earning capacity until she regains work and under the orders of this case figures out what an appropriate work schedule is for herself. Therefore, given these findings, it's a long way of reaching to say that the court cannot find at the present time that either party has earning capacity past their base regular pay that they're each receiving from their employment.
Mr. Christolini came to the marriage with substantial premarital assets. It's hard to reach back, for anybody to reach back to 1985/1986 when we're in the year 2000. Perhaps the millennium didn't end up in CT Page 5085-iz resulting in everything stopping but as time goes by it certainly is harder for both parties to retrieve the records and it's testament to the length of the marriage that they've had till now.
All right. It is clear and the court can find that his premarital holdings in the form of some kind of deposits in the banks was somewhere between a hundred and seventy-six and two hundred and ten thousand dollars, which by any characterization are substantial assets. He also owned the commercial building which he continues to own with a partner in Watertown.
The plaintiff had premarital holdings of somewhere around seventeen thousand dollars, which could have been as high as twenty thousand dollars depending upon how you count it on any given day. Both parties had modest retirement funds from their respective employments.
During the marriage Mr. Christolini also received funds from non-earned income sources and they are, unfortunately, as a result of the passing away of his mom. He received an inheritance which came in dribs and drabs or pieces, however you want to characterize it, which totaled just under thirty-three thousand dollars. These came late in the marriage.
The other source of funds was the result of a malpractice action which was pursued by the family as a result of the passing away of Mr. Christolini's mother. It rendered forty-six thousand, I think it's forty-six thousand a hundred ninety-two dollars to Mr. Christolini, which he received on or about May, 1999. The court does note that the return day for this action was in April of 1998, approximately thirteen months prior.
This case was started after the automatic orders law went into effect and I think it is a testament to the behavior of both parties that neither party sought enforcement of the automatic orders. Both parties engaged in behavior which was arguably in violation of the automatic orders in terms of retaining and protecting assets. The court does not find that there was a quid pro quo agreement that Mr. Christolini could remove twenty-five thousand dollars to cover the funds that he felt he had extended for the van. However, in his own mind the court is sure that he felt he should do it based upon that and so that he withdrew twenty-five thousand dollars at that time. He then withdrew another seventy-five hundred dollars at a later date. Similarly, Ms. Christolini, feeling that she didn't have enough money to pay her needs and expenses and feeling similarly challenged and threatened by the financial crisis the parties were creating for themselves as a result of CT Page 5085-ja the dissolution action, made withdrawals as well; they were twelve thousand seven hundred and thirty-six dollars and sixty-six hundred dollars, respectively, in `99 and 2000 from her B-U-R-S-P account, about three hundred dollars from her TRASOP, about nine thousand and four thousand one hundred and eighty-eight from other SNET accounts.
It is absolutely mind boggling when you compare the math that both parties took out about thirty-two thousand dollars. And so it's not behavior either of you should feel particularly proud of but I guess you did your tit for tat and the court's going to decline, as a result, to enter any equitable orders refashioning those sums as a result of the automatic orders. I will tell you, and this is a digression for a moment, that this is part and parcel of somehow the Christolini dissolution action sort of avoided the court system much to the detriment of everyone in some ways. Most of the time I'm happy when people stay out of court but sixty-four thousand dollars has all but disappeared with only the accounting done, apparently, in the courtroom at the time of the dissolution of marriage. No one was ever ordered to vacate the house, there were no orders on how to sort of equitably access the children till late in the divorce, and the result, the parties engaging in their own conduct as they saw fit, sort of did what they thought was right for themselves, who knows, for the kids, maybe, but it was a lot of self-help for two years rather than conduct which perhaps would have been a little more moderated had it been subject to the scrutiny of court orders and that is unfortunate.
The court wants to emphasize that both these parties have been hardworking financially and their financial rewards have been found in the various assets that they have amassed and, clearly, some of it with the assistance of Mr. Christolini's premarital holdings which helped with the ability to leverage and purchase as they did, for instance, a home with no mortgage.
One of the factors the court must consider, and rarely enjoys doing so, is what the cause of the breakdown of the marriage is and whether either party is at fault for it. It's not exactly clear what the cause of the breakdown of the marriage was because the parties didn't talk well enough and that probably was the cause of the breakdown of the marriage but had they talked about it they would have been able to pin it. But, from the court's observances the following findings are made as to what the cause was. When these parties got married it is fairly clear that they knew who each other was but that the personalities are extraordinarily different and Mr. Christolini, as he's described himself and everyone else has described him, is a fairly serious individual who CT Page 5085-jb from time to time can be fun-loving and has a fairly disciplined sense of how things should be done to get to the end result as efficiently and as cleanly as possible. And, Mrs. Christolini couldn't be more opposite. She's a more light-hearted person, not too worried about the process to get to the end result. Both parties had in mind, however, the same end result when they got married and that's probably what they talked about and in large part caused the marriage.
Here's what happened as the court can see it. Over time Ms. Christolini, who had lived a fairly, although the evidence doesn't support it, the court infers, a fairly sheltered existence, came to believe that there was another way to live than the way Mr. Christolini lived and came to bridle under the lifestyle Mr. Christolini had. That doesn't mean it's a good lifestyle or a bad lifestyle or that her choices are good or bad but as she developed her own choices they became inconsistent with Mr. Christolini's and it caused conflict.
Mr. Christolini is a person who sort of presumes his way is the right way to do things whether it's in the cabinet or in the garage or the same and Ms. Christolini did not feel free to question it in a healthy and assertive way and that is because Mr. Christolini is assertive and can be loud, I am sure, and does not discern that as threatening to another individual but Ms. Christolini did discern it that way. This court does not believe that Ms. Christolini was ever at risk physically in this marriage but because each of them viewed their interpersonal relationship so differently she felt lessened in the power structure between the two of them and therefore acted lessened and Mr. Christolini similarly felt free license therefore to continue in the way he had been because no one was saying it wasn't okay. That's what marriage counselors are for and it would appear that these parties did not engage in any significant or serious marriage counseling, if at all, and so the marriage was not nurtured and fell apart.
The easier thing to do would be to say Mr. Christolini is at fault because he had the manner that was more overbearing on Ms. Christolini; however, Ms. Christolini knew who she was marrying when she married him and simply at a certain point decided this was something she couldn't live with anymore. No one's at fault for that and the court can't find fault base upon that, they're just two separate, different individuals. And the court does not find fault, I want to be clear about that.
The problem, however, is that, once the divorce started, Mr. Christolini, the court finds, brought that same personality to the divorce process and when parties are no longer functioning as a marital CT Page 5085-jc unit it became problematic and here's where the problems emerged. The house became a battle zone for both of the parties and for the children. It is clear to the court that Mr. Christolini felt abandoned and rejected by Mrs. Christolini for himself, for the children and for the family and reacted accordingly and often confused his own emotions as feeling rejected as a husband with the needs of the children. Those are two very, very separate different things and this is one of the reasons this court is absolutely convinced that these parties should not have continued to live together because the ever present marital conflict never gave room to allow these parties to develop independently in separate homes as capable able parents and these children have suffered as a result of that.
That description that I've provided basically became the blueprint for the behavior as between these two parties from the time immediately filing the dissolution of action forward and this court sees it as a remedy for no one and a recipe, really, of disaster for these children and most unfortunate.
At the outset this court finds and believes that both parties are able caregivers for the children and there is no doubt in the court's mind that on a day to day basis both of these parties can take care of their children. It's simply not an issue. What the court is considering to do, however, is to make orders regarding custody and access to the children and the preliminary question that the court has to confront is whether the court's going to order joint custody or sole custody. Our law provides that joint custody is preferred and I think the language is something like it affects the proof. Essentially, in plain language, it is that there is a presumption in favor of joint custody. And, if this court is disinclined to order joint custody it must state on the record the reasons it's disinclined to do so. This court is disinclined and will not order joint custody and it's for the reasons stated hereinafter but I will start with the most basic and, that is, these parties have both acknowledged on the witness stand that the communication between them is awful; it's not positive, it's negative. In other words, they talk but they don't talk well.
Joint custody requires positive communication between parents; an ability not only to speak but to listen to the other parent and to consider the position of the other parent in terms of the needs of the children. For the reasons of the battle that has occurred between these parties and the reasons of the perceptions of the different bargaining power between the parties, the uneven playing field in terms of decision making, they are unable to make decisions jointly. CT Page 5085-jd
This court has little doubt that on a day-to-day basis they can make small decisions but nothing that requires an acknowledgment by both of them of the need for the other parent as an integral part of the children's lives, nothing that will require both of them to put the children ahead of their perception of the respective needs of themselves will put the children's needs first. And, a large portion of this may well be because this dispute has occurred for so long. The conditions that have decayed what was an already tenuous communicating relationship and a very bad have been allowed to continue for two years such that the household cannot function and these parties cannot talk in a civil way with each other.
So, the court is constrained to consider which parent is an appropriate sole custodial parent and from thence where the children should live and how the children should be insured access to both of their parents, which is fundamental to the decision making in this case. It is a priority, a principle of family law that the court must consider the respective willingness of each of the respective parties to honor the needs of the children for the other parent and in this case these four young children, ably represented by both counsel and guardian, have both expressed and evidenced by their behavior a need for access to both of their parents and so the court considers the respective regards in this.
The court also must look at the long haul in terms of who has provided care for these children both historically and currently, the nature of that care and the judgment that has been utilized by each parent from time to time and the court makes, with that in mind, the following findings. First of all the court finds that, historically, notwithstanding protestations to the contrary, that the plaintiff Mrs. Christolini has been historically the primary caretaker of these minor children from when Thomas, Jr. was born in 1986 forward.
Indisputably until 1995, besides the parents, the paternal grandmother played an important role in these children's lives by the acquiescence and approval of both of the parties. It is not insignificant to the court that the major decay in this marriage occurred after she passed away. She was, clearly, by reference to her with respect by both of these parties as well as other relatives, a strong, positive influence in this family who, not only the children but both of the parties present before the court gained much from and lost a lot and this marriage and family lost a lot when she passed on.
Her role, however, was not the only role and both of these parents had CT Page 5085-je roles in the marriage and with the children. Mrs. Christolini was, based upon the schedule the parties had created for themselves, the primary parent as between the two of them. Her schedule allowed for her to be able to take the kids to the appointments they needed as evidenced by the pediatrician's witness here, to make, as the kids grew up, for their appointments for dentist, boy scouts, basketball, to be the contact with the school, the primary contact with the school, and a laundry list of other events such as that. This is important because it is thread of continuity for the children not because she's necessarily to be praised that this was a superior role. It's simply the role that the parties selected for the children as how they were going to divide their parenting responsibilities as these children grew up.
Mr. Christolini took a role that was different from that but no less important. He became the primary financial wage earner for this family that was dedicated to the idea of providing well for their children. He was not a disinterested parent and the major battle over what happened historically should not lead to that conclusion. He was an interested parent, who worked very hard, very long hours, was tired at times when he wasn't working but was very interested in the concerns of his children as they were raised and contributed when he was home. There is little to suggest that that is not so.
What troubles the court, however, is that once Mr. Christolini felt his marriage was taken away from him and that his wife had left him engaged in a battle to try to take the role of primary parent over from Ms. Christolini to prove himself as a parent to the exclusion of her without any insight as to the affect of it upon the children and their relationship with the mother. That Mr. Christolini may have wanted to spend more time with his children after the filing of the divorce is not subject to criticism, it's an ideal goal. However, the court does find, based upon the evidence that is presented, that by his behavior and demeanor to the children as the wronged individual in this process of divorce that he sought to make the children his allies in the process; this is not good for children. Children suffer greatly when their parents get divorced and maybe Ms. Christolini will live all her life with the notion that she filed for divorce while her children were young. However, she is entirely within her rights to do so and we then pick up the pieces from there and decide what is a proper parenting arrangement for these children now that the parents will live separately.
The children do not become tokens to be fought over and the court finds that Mr. Christolini has engaged in that battle and that the children have been losers in it. They should never have been brought to a doctor CT Page 5085-jf and asked what they wanted. They should never have been told to make choices, it's a poor exercise of judgment. Not done because it was in any way to hurt the children, the court does not infer that that was Mr. Christolini's choice or desire, in fact, probably just the opposite but it was part of Mr. Christolini confusing his desire with what was good for the children, which is supposed to be what comes first.
The court also finds that Mr. Christolini has discussed the dissolution of marriage and its tangential aspects in front of the children, which has caused stress for them. It's another poor choice and a poor exercise of judgment. The fact that he and Mrs. Christolini have to live with this dissolution doesn't mean the children had to. It was bad enough for the children that the parents stayed in the same house with them for two years, they did not need to have the divorce in their face on a current basis.
The court finds that Mrs. Christolini does not question that Mr. Christolini is an able caretaker for the children. Her criticism of him is his efforts to exclude or minimize her influence on the children through this process and the sleeping with the children. Both of these will be addressed.
Mr. Christolini on the other hand has provided and asserted to the court that he is concerned about Mrs. Christolini's ability to caretake these children. One of the concerns he expressed is, quite ironically, is whether she will be able to lift the children and caretake them with the disability that may result from her eye. It is ironic to the court because Mr. Christolini testified that he didn't know she had her most recent eye surgery and that's the reason he called the employer to find out about that and why she wasn't back at work. Well, essentially, the court finds Mr. Christolini knew when Ms. Christolini had surgery, if not immediately before then immediately after and knew what was going on with her but resented her ongoing omnipresence in the house as a result of the disability and therefore was frustrated by it and wanted to contact the employer. The court doesn't believe he was trying to undo her employment, that would have not been sensible for him to do and he is not constrained to do that. However, it is not a reason to question her ability to caretake the children, only it presents an irony to the court in terms of his feigned ignorance as to her well-being and health problems with her eyes.
He also questions whether she drinks to excess and it risks the children. There's very little evidence on alcohol consumption before the court. Mr. Christolini's sister describes one incident in which arguably CT Page 5085-jg Mrs. Christolini was inebriated. However, the conduct that was described was not so egregious to suggest that she was necessarily drunk or very drunk if she was inebriated. It was a description of an excessive giddiness and perhaps excessive whimsicalness about the hanging of a picture. That does not add up to an alcohol problem.
The other evidence educed was the wine bottles that were both empty and full, one set of each, in Mrs. Christolini's bedroom which Mr. Christolini had availed himself of access to it after having peered in her window from one foot away and seeing her do something that appeared to be the drinking of a bottle. The court has insufficient evidence as to the chain of custody of those bottles to know where they came from and just the parties competing credibility as to where they did come from. And, even if they were Mrs. Christolini's, insufficient evidence as to how much time it took her to drink the bottles if she drank those bottles, whether it was in measured quantity or excessive quantities. Therefore, the court cannot from that conclude that the plaintiff has a drinking problem. But what the court can conclude is that Mr. Christolini, in his battle to win these children, was not even in one modicum respectful of Mrs. Christolini's privacy. He felt free to peer in her bedroom, which is her one piece of personal space, and then to go in her bedroom unannounced in a surreptitious manner without prior notice to her. It is absolutely essential, if these parties are to have joint custody or be responsible caretakers for the children, that they engage in some minimal level of respect for the other party who is the other parent of the children.
The last reason that Mr. Christolini points to that Ms. Christolini would be a caretaker that he would have concerns about for the children is her social calendar that she has maintained over, depending upon whose records you're keeping, two to three years. The social calendar, and the court reviewed the records and the logs of the social calendar without even knowing whether they're particularly accurate or not, are not excessive in any case. What they do reference is an attempt by Ms. Christolini to not be present at the time that was informally ascribed to Mr. Christolini for the caretaking of the children and an effort by her, as testified to by her and the court accepts, to increasingly avoid conflict.
That there was conflict in this home is just inescapably a conclusion and the tenacious manner in which Mr. Christolini has pursued this battle in quest for his children, as evidenced by these books and by the other evidence the court has referenced, leads the court to the conclusion that Ms. Chistolini's view of what the household was like is the more reasoned CT Page 5085-jh view and that is that Mr. Christolini was not respectful of her time with the children, was critical of her caretaking of the children and verbally denigrated her in front of the children.
The shame of this matter, the court is convinced, is that if Mr. Christolini had not decided through his bitterness over the end of this marriage to engage in such a sustained battle in such a relentless way for these children that different orders would have resulted but that as a result of this conduct it makes it impossible to rebuild and sustain a joint custodial relationship. And, frankly, it's a shame.
The court also, therefore, must reference the other individual incidents which all by themselves may not be terribly significant but are indicative of the poor quality a relationship between the parties. When Janine was given permission to go to the ice cream shop, it's not so important whether the parties would have disagreed about whether she could go to the ice cream shop, reasonable minds could have sorted that out, the problem, which perhaps everyone was missing is, Janine should not have been put in the middle in the middle of a custody dispute between her parents to go tell her mother. It put Janine in the position of having to make herself vulnerable to her mother when she knew her mother and father were in the middle of this dispute. It was just poor judgment. Had the parties been a happy married family, things like that happen often, but that's not the context in which Janine was given this instruction and so, therefore, the child was put in a vulnerable position.
Joint custodial decision making requires the parents to leave the children out of the conflict and rise themselves above whatever their personal distaste may be for each other to communicate in a healthy and productive way for the benefit of the children. This was clearly not present here.
As to whether or not Mr. Christolini left her alone or didn't leave her alone and made adequate arrangements, this court's not going to take a position on that because, essentially, it would appear from all accounts here that he had discerned that there was another parent present and made some decision making that in all probability would not have been questioned in the context of a healthy marriage. It was the communication problem that was important about that incident.
As to Joey running out in front of the car, the court has no clue whether Joey ran away from his father five seconds before, his father had three other kids tagging onto him and it took a minute to catch up or CT Page 5085-ji not, the context is not clear to the court. That Joey's lucky he didn't get hit, I'm sure we can all agree about that, but the court is not going to infer that any conduct was inappropriate by Mr. Christolini under those circumstances. It's a vignette in time without context and the court makes no inference from it. That any adult seeing a child starting to step out into a street has the heart go into there thoat — Sure. But the context is not sufficiently clear to the court that the court can ever draw an inference that Mr. Christolini acted inappropriately there.
Mrs. Christolini has been, as the court indicated, the primary caregiver for the children at least until late 1997/early 1998. The court finds that the depression in 1993 that she suffered did not in any significant way diminish her ability for the long term care for the children. Undoubtedly, over the period of time that she was home some of her responsibilities were by agreement deferred to Mr. Christolini's mother and at times when he was home from work to himself. This was not a sustained period of time.
The cause of the depression this court cannot discern; it's not a medical position that was provided through expert testimony for the court and the court makes no conclusions. The plaintiff asserts that there were stressors in the marriage and Mr. Christolini had threatened divorce immediately prior, within weeks or a few days before. Mr. Christolini was silent on that topic but there was an acknowledgment that there was distress and tension between the parties and all that does for this court is indicate that this marriage has been under high stress for a very long period of time.
The incident over Christmas 1997 with T.J.; it was very interesting because Mr. Christolini's sister was clearly his ally, she's fond of him, it's her brother, there's no reason why she should not to have felt that way. But, she acknowledged to the court that Mr. Christolini had lost his temper, he was yelling and she protested more than once. He didn't hit T.J. She did at one point acknowledge that he was going to hit T.J. The court doesn't know whether she meant with a belt or not with a belt but she acknowledged that Mrs. Christolini at that point interceded.
This incident is important because it indicates that on holidays such as Christmas there was an extraordinarily high, heightened level of tension between these parties and that the children were in a position of being the losers once again in suffering from that tension.
Mrs. Christolini's assertiveness to intervene was indicative of a CT Page 5085-jj change of position that she had started to feel in her role in the marriage starting in 1997. Her desire to go out socially is not something that this court is in a position to condemn over a marriage as long as this marriage with the limited amount of time that these parties spent vacationing or nurturing their marriage separate and distinct from the children is inevitably going to result in one or both of the parties seeking some social contact outside of the scope of the marriage. It is clearly one of the causes of the breakdown of the marriage that these parties did not take time outside of their children to nurture their marriage and it's a tragedy, frankly.
The court does not find that Mr. Chjistolini has proven that Mrs. Christolini was engaged in an extramarital affair either expressly or in some sort of implied way. The evidence does support that Ms. Christolini was going out occasionally, a couple times a month, to visit with friends who were largely female but occasionally included some males and that there was no segregated relationship of her with Joseph Carrah or any other male individual presented to the court. Perhaps it would have been a resolution for Mr. Christolini as to why Ms. Christolini was leaving and provides an answer but sometimes the breakdown of the marriage is a little more complex than that kind of solution.
The increased time of Ms. Christolini away from the home after that date and after the filing of the dissolution was a product of a variety of circumstances. Mr. Garrity in his report suggests it was to solely avoid the tension of the household and the unyielding position of Mr. Christolini in regard to her, vis-á-vis, the children. The court finds that those circumstances support Ms. Christolini being away from the home on the basis she was away from the home and, also, that there was positive social interaction in other environments which seemed a little more palatable than the tension of the household and that that influenced her behavior as well.
It could be inferred from that that Ms. Christolini was therefore less attentive to the children and that the children suffered as a result of her absence from the house. It also can equally be inferred that her absence from the house saved the children, on those times that she was away, from the continued conflict between these parties and the court: finds the latter.
It is entirely unrealistic and irrational for this court to believe that somebody who has been a primary parent devoted to the children in the way and to the extent that Mrs. Christolini was devoted to her children was not only going to decide she wanted her marriage over but CT Page 5085-jk also decide she was no longer committed to her responsibilities as a parent. It's simply not a position that's supported by the evidence and the court cannot so find despite the position of Mr. Christolini in this case.
The court is equally unconcerned, therefore, that at the end of this case and the end of these orders that Ms. Christolini will in some way be unavailable to her children on a day-to-day basis. The court is satisfied that she will be available to them absent the ongoing conflict that has occurred between these parties.
The parties also disagree about the nature and extent of discipline of the children and this is beyond the issue of who is sterner or more disciplined about picking up shoes or the like, that is not a significant issue. It is significant that Mrs. Christolini does not favor in a strong way any kind of physical discipline, particularly the utilization of a wooden spoon; Mr. Christolini, under the appropriate circumstance does. In this instance the appropriate circumstance as described to the court was something approaching food fights at the kitchen table. The court will point out that nothing in the evidence suggests that the utilization of these wooden spoons resulted in any kind of physical harm to the children.
The court is not going to take a position as to which party is right because of the two different styles and it is clear, simply from this strong difference, that the parties differ significantly as parents. Perhaps not in their goals and wishes and desires for the children but where they draw the line on certain things as parents and how they respond to them and this over time has contributed to the conflict in the marital home. It may be a matter upon which reasonable minds can disagree but it is not necessarily a matter on which a mother and father can continue to coexist amicably because both parties have strongly held opinions on this and therefore it caused conflict.
The court is aware that Mr. Christolini felt particularly wronged and abandoned. Not only because Ms. Christolini chose to end the marriage but he felt he had been generous in his financial largesse immediately prior to the dissolution of marriage by the purchase of the van and the attendant circumstances around that and this caused a sense in his mind of additional bitterness and perhaps of being used prior to the onset of the dissolution of marriage. Unfortunately, the marriage being over, the conflict between the parties over this simply resulted in more conflict for the children. CT Page 5085-jl
The court had before it the expert opinion of two witnesses' and the first one was Dr. Albert Levis, and Mr. Garrity. The court allowed, after argument and testimony, Dr. Levis to testify as an expert. He is a psychiatrist licensed in the state of Connecticut with significant clinical experience and he has also evolved over time his own theory that can be utilized in evaluation proceedings and the court has before it the result of his work. Before even reaching or revisiting the State versus Porter issue in regard to Dr. Levis, after having reviewed his work and heard his testimony, the court has the following concerns with Dr. Levis' expert opinions.
First of all, he never met Mrs. Christolini and never worked with her at all and, therefore, the preliminary input that he received was only from the point of view of Mr. Christolini. The extent of that problem is unclear because he was rather general and non-specific in his description of the preliminary information that he took. Perhaps of far more concern, however, is the following. His work with the children was not in a controlled environment in two respects, both of them significant. The minor children were all present with no safeguards against copying of the work. The ammals drawn, on very close examination by this court, suggest that copying in all likelihood was present. He could not in his testimony assure the court that there was either safeguards against copying or sufficient observation by himself at all time that he can ensure that copyinq did not take place.
So that the record is clear as to what the court is referencing, it's part of Dr. Levis' procedure to have the children draw certain animals, or balloons or balloon structures describing or naming or identifying the various family members and he ascribes significance to both the animal selected, the placement of the animals, and the posture of the animal in terms of facing forward or not. If there was copying then the internal thoughts and opinions and feelings of the children were not independent and, therefore, did not have integrity on their own. Further, Mr. Christolini was, if not all of the time, part of the time present in the area that the work was being done. This is through no fault of Mr. Chistolini's, he's not the evaluator, he's not the doctor, he doesn't know whether his presence is required or not required. However, Dr. Levis assured us all the while that there was no undue influence but the presence of Mr. Christolini, by itself, this court finds in all probability acted as an inhibitor for the children and the work with the children should have been done outside of Mr. Christolini's presence. And, therefore, whether or not any interference occurred, there was no safeguards against direct or indirect influencing of the work of the CT Page 5085-jm children by Mr. Christolini. And, therefore, the work of Dr. Levis does not have sufficient safeguards or controls of the environment for this court to accept that his results have integrity on their own.
The other problem was that under Dr. Levis' work the interpretation is important in terms of his theory. It's important, as the court indicated, what animal was chosen and how the animal was placed. It would seem to the court that it would be essential for him to elicit from each child what animal was chosen and he failed to do so. In the instance of the ascribing of the pig to the mother this court cannot independently discern on a common sense basis that the drawing elicited from Thomas was the drawing of a pig and not that as suggested by the guardian, a monkey or yet a third animal. And since it is important to Dr. Levis' work as to what animal was drawn for the conclusions reached the court cannot accept the conclusions, particularly in the significance of them in regard to the oldest child.
Finally, Dr. Levis could not sufficiently explain why it would be important to the children's alienation from their mother, as he asserted it existed, that the drawing of the mother was faced away from the children in one instance but that when the drawing of the father animal was faced away from the children it was of no significance. There was no internal consistency in those two conclusions.
As a result of these deficiencies the court need not go further as to whether it accepts the results of Dr. Levis based upon his theories as proffered to the court. The court rejects his expert testimony as not helpful because of the deficiencies described herein.
Mr. Garrity was the other evaluator and the record should reflect that these children suffered while Mr. Garrity was reassigned by Court Support Services Division from the civil work to the criminal work for a sustained period of time as evidenced in his report. And these parties suffered during that period of time not because Mr. Garrity had any particular magic answer but that the process of the evolution of this case to trial was delayed while he was not accomplishing and completing his work.
It was through Mr. Garrity's testimony that the court found out that Mr. Christolini is affianced to a woman named Ruth Monroe. This was not contradicted and was not a part of Mr. Christolini's case. As a result he failed to provide me with the opportunity as the court to listen to her and observe her as someone who will be an important part of the children's lives. The court draws no conclusions from this except for CT Page 5085-jn that it would have been preferential that in seeking significant if not equal or more time of the children with him, if not equal time but primary access with him, that the other adult member, potentially the stepmother of these children, be presented as an able caretaker of the children to the court. Perhaps this was inevitably so, however, because Mr. Garrity's testimony was unrebutted once again that the children had never in a formal way met Ms. Monroe other than chance encounters and, therefore, the nature of their relationship and the interdynamic of that relationship could not have been properly presented to the court and perhaps that is therefore the solution to her lack of presence.
Mr. Garrity ultimately concluded and recommended that Ms. Christolini have sole custody of these children with a prescribed schedule of access and other orders and his conclusions are not distinguishable in any significant way from the court's own independent conclusions from the evidence. Perhaps the only insight that Mr. Garrity had that this court does not necessarily accept is that he believed Mr. Christolini's behavior in the last couple of years has been to punish Mrs. Christolini and the court does not ascribe quite those evil characteristics as Mr. Garrity did to Mr. Christolini. Instead, the court views, while Mr. Christolini did engage in a battle and it was, as described previously, detrimental to these children, the courts s view is that it was more of a battle of a sense of desperateness at the impending loss, from his perspective, of his children after a sense of loss of marriage and wife and that's not the same thing as punishment. Perhaps it's ultimately a distinction without a difference but this court believes that it is important in terms of the ability of these parties to ultimately rehabilitate, in some respect, their relationship for the benefit of the children over the years to follow.
A significant issue that has emerged from the beginning of this evaluation process to the date of trial is the girls, first of all the children and then the girls sleeping with Mr. Christolini. First of all, the court's going to make the following expressed finding. There is absolutely nothing in the evidence for this court to construe and infer any inappropriate conduct by Mr. Christolini with the girls in the bed environment. And the court is expressly stating that because it's a crazy world out there and it's important to be very clear about that.
However, that put aside, here is the problem from the perspective of the court with the dynamic that was created. The children of a divorce, and these children, seek succor and nurturance wherever they'll find it because they feel threatened by the loss of their intact family unit. And, Mr. Christolini's presence at sleep time provided that but provided CT Page 5085-jo it in a way by allowing the children to stay with him, that undermined their necessity of maintaining their independence and sense of self that children gain by having their own space in their bed and learning to sleep on their own and all the things that I am convinced these parties agreed about until the dissolution came.
And, their comfort to Mr. Christolini the court doesn't doubt also existed because kids are great positive bearers of nurturance as well. The problem with is, is that bad habits are hard to break and, therefore, even as evidenced by Mr. Christolini initially giving them some money, a dollar a day to not come in as evidenced or any similar contact of that nature indicates that the children become reliant and lose their sense of independence themselves when they sleep on a sustained basis with a parent. And, one need not be a student of history of anything but the Greek myths to understand that children, as they hit their adolescent years need to very much learn to individuate to become individuals and to maintain themselves separate from their parents and that's one of the reasons they sleep alone.
The problem then became, not only that the girls became reliant and preferential to sleeping with their dad but it became another part of the battleground between the parents. And so it became harder for Mr. Christolini to walk away from his position because it was a position being imposed by Mrs. Christolini. This is not good for the kids.
The orders that were entered last month in the local court, there's nothing to suggest that they have been violated and the court is confident that, as part of the orders, just simply prohibiting the continued sleeping of the kids with Mr. Christolini, the court has no doubt Mr. Christolini will honor those orders. That the children will bridle against it at times, that the children may from time to time have nightmares or the like, there will have to be other creative ways to find to support them through their difficult time.
The health problem that one of the girls had with her heart, I believe it was Janine, maybe it was Marie, I can't remember, I'm not reading my notes right now, may be a real problem but it's not a reason, barring medical testimony to the contrary and medical evidence received by both of you as parents, to change her sleep habits. It provides a parent assurance, it's not unlike having your newborn baby and going in with a mirror to make sure the breathing's still going on, we've all heard those stories, but at a certain point the parents have to leave the children to their individual ability to sustain themselves throughout the night. It is what strengthens the children even if it creates distress for the CT Page 5085-jp parents while they wonder. It is absolutely essential.
These children, it would appear from all accounts, are extraordinarily fun children and like each other and are in many ways resilient. They are well bonded together despite their ages and rely heavily upon T.J. as their leader of sorts. And, notwithstanding the conflict, it is a testament to both of these parties, and indeed to Mr. Christolini's mother, that these children are so fine to be loved and respected by both of you at this point.
The court has some concern about one issue which it can't enter orders about and isn't going to enter order about and just hope both of you figure out a way to work with and that is this. Inevitably the orders of the court are going to divide the children's time up and so each of you are going to feel their time with you is all the more valuable. T.J. appears to enjoy, in his own individual way, his separate relationship with his cousin at George and Susan Christolini home with his Friday night overnights; not every Friday night, I understand that. Both of you, I would implore you to find a way to respect this separate and special relationship he has built with his relatives. Perhaps it's not as special as it seemed in the court, perhaps it was overplayed by someone but it wouldn't appear that it would have been necessary to do so and therefore it would appear to be genuine and I will not enter orders about it but I hope you find room, both of you, to respect and nurture his relationship there.
The court's aware that there's been a request that the girls and boys be split up for a dinner with each of the parents so each of the parents will have a separate time with the girls and with the boys. But, if nothing else has become very clear to this court, it is that these four children, while they're separate and do different things from time to time, gain strong benefit from acting as a unit and I am not going to tinker with that.
If, over time, as the children mature past this dissolution of marriage and seem themselves to want that kind of separate time, hopefully the two of you are talking and will figure out a way to accommodate the needs of your children but the evidence before the court would suggest that for now the brood will come and go altogether.
The court is also aware that they have a sense of comfort in their home and that it is the only home that a couple of them have known and has been a source of refuge for the older children and particularly T.J. and the court enters orders with that in mind. CT Page 5085-jq
There have been a variety of financial assets that have been amassed by the parties both premaritally and during the marriage and much to their credit and the work of the attorneys there have been stipulations as to value as to all of the significant assets. The law requires me to make findings as to value and therefore the court will do so prior to entering orders.
The court finds the value of the marital home at Pheasant Road, Watertown is two hundred and seventy thousand dollars. That the value of the back lot is fifty thousand dollars. That the value of the Main Street commercial property is two hundred and four thousand dollars, which is less than the value that it was at the time of the parties' marriage. That Mr. Christolini's present value on his Federal Credit Union is sixty-four thousand dollars. That he holds in his possession cash in the amount of forty-six thousand one hundred and ninety| two dollars, which represents the proceeds of the malpractice action earlier retrenched. That he holds in his possession seven thousand nine hundred dollars, which represents his collected share of the net proceeds from and to date of the rentals from the Main Street property.
The court's going to digress for a minute and go over that property. I hope for Mr. Christolini's sake and his partner's sake that he never has an audit on that property because the record keeping that was suggested by the evidence would suggest he'd never survive an audit. That, however, is a long way away from suggesting that any money, A, is hidden or, B, hasn't been properly accounted for. The loose record keeping and accounting back and forth as between he and his partner, while challenged, no alternative was provided to the court as to the real situation if that were not the real situation. And the court has insufficient evidence to find that he was not providing for the buildings in the manner that he described.
It's one thing to attack his lack of memory on some issues or his acquiescence to sort of not knowing what Mario is doing in time, it's another thing for the court to be able to find findings of something entirely different. While the fast and loose method of operation is extremely unusual among partners no alternative method was provided to the court for the court to find anything but what Mr. Christolini presented to the court.
The savings bonds the parties have dealt with and therefore the court need not make findings beyond the division that's occurred. CT Page 5085-jr
Mrs. Christolini's pension plan, the present value is forty-four thousand three hundred and eighty-nine dollars; her TRASOP is seventeen hundred and thirteen dollars; her B-U-R-S-P is forty thousand five hundred dollars.
Mr. Christolini's Fidelity Annuity is one hundred and fifty-one thousand a hundred and seventy-two dollars; his IRA is ninety-two thousand two hundred and ninety dollars; his Raytheon 401-K is a hundred and twenty-seven thousand a hundred and fifty-nine dollars; his Raytheon pension is twenty-eight thousand eight hundred dollars; his Perkin-Elmer pension is four thousand nine hundred and twelve dollars.
The court finds the '88 Town Car has a value of three thousand dollars. The Buick LeSabre, five hundred dollars. The `88 Chevy Ventura, based upon the evidence provided to it the court is constrained to find a value of eight thousand five hundred dollars although unless it has excess miles or dents the court's inclined to believe it's probably a little higher.
Ms. Christolini's First Union checking has a value of two thousand dollars even though the financial affidavit was less and the court should note that Mr. Christolini's seventy-nine hundred dollars cash on hand was not disclosed either on his financial affidavit but both sums came out during trial. Ms. Christolini' s Federal Credit Union is twenty-five dollars.
There are custodial accounts for thirty-eight thousand dollars each that has been disposed of by the parties' stipulation.
Mr. Christolini currently holds the health insurance for the benefit of the minor children.
The furnishings have been disposed of by stipulation.
The evidence, as indicated by the court on the withdrawals, suggest that had the withdrawals not been made by each of the parties in the amounts indicated, with the benefit of appreciation, although who knows in these market conditions, may well have been substantially higher but the court is left to the division of the marital estate as presented.
Less there be any misunderstanding, premarital assets and inherited assets are a part of the marital estate subject to division. I'm not saying what I'm going to do with them but I just want the law to be CT Page 5085-js clear. However, the court does consider the source of the funds or asset and what efforts each party made to the respective accrual of that asset as with any other asset.
The court also had approved previously the bill of the attorney for the minor children at eight thousand nine hundred and eighty-two dollars and fifty cents and the GAL of ten thousand seventy dollars and fifty cents. They didn't include today and I don't know what counsel are going to do about that but the court noted they ended yesterday and I don't if the four hours for yesterday was sufficient to cover yesterday so counsel will have to make those decisions.
The court's going to make the following orders. The court orders that the plaintiff mother shall have sole custody, legal custody of the four minor children. And she shall have . . . physical custody of the minor children subject to reasonable rights of visitation in the defendant father as follows: Every other weekend, commencing this weekend, from Friday after school or work to Sunday at seven p.m. What after school or work means is, Mr. Christolini can determine from his work schedule whether he's going to be able to retrieve the children after school. If he can't, they'll go to the arrangements that will have been made by Ms. Christolini and then he'll get them right after work.
Every Tuesday after school or work, as just indicated, to seven p.m. On weeks where the weekend ahead he will not have the children, so that if it's going to be, as the expression goes, Ms. Christolini's weekend, he will also have the children for dinner on Thursday from after school or work till seven p.m.
He will be entitled to reasonable telephone contact with the children on a daily basis. Reasonable, hopefully, is not a matter in which the parties will disagree. However, the court will provide the following guidelines in case there is a disagreement. There's no reason, barring illness, to talk to the children more than once a day and more than for a few minutes a day unless the children have suffered some particular kind of trauma or wonderful event that he wants to share with them for a longer period of time on the phone.
Mrs. Christolini shall provide Mr. Christolini notice of extracurricular activities of the children and school schedule so that both parties are sharing that information for purposes of both their role as parents and their schedule purposes. And she shall inform him of the health issues of the children as they arise. She shall provide him copies of the children's report cards and any other notices about their academic CT Page 5085-jt social progress that she receives in writing from the school as they arise.
Each party must, on this schedule and the balance of the schedule that the court provides, take the children to their activities that come up while the parent has the children in their physical care.
Mr. Christolini is not to allow the children to sleep with him whether in his bed or their bed. At all.
On weekends that are Mr. Christolini's weekend and Monday is a school day off, with the exception of Memorial Day, if Mr. Christolini is going to be able to take the Monday off to spend it with the children he may do so and have the children back to their mother by seven p.m. but he's got to give her seven days' notice of the intent to do so that she can make alternative arrangements if not. And that's another reason why it's important that Mr. Christolini have the school schedule, so that he knows when he's going to make those arrangements.
The following holiday and vacation schedule supercedes the regular schedule that I've just provided. Mother's Day shall always be with Mrs. Christolini; Father's Day shall always be with Mr. Christolini. In even number years Christmas Eve until ten p.m. shall be with Mr. Christolini and odd number years he shall have Christmas Eve to ten a.m. Christmas Day. In even number years Mrs. Christolini shall have the children from Christmas Eve at ten p.m. through Christmas Day and in odd number years she shall have the children ten a.m. Christmas Day through to the following morning.
Mr. Christolini shall have the children on Easter in even number years; Mrs. Christolini Easter in odd number years. Mr. Christolini shall have the children on Good Friday to ten a.m. on the Saturday after in odd years; Mrs. Christolini Good Friday to ten a.m. on the Saturday after on even years.
Thanksgiving Day ten a.m. to nine p.m. Mr. Christolini shall have in even years, Mrs. Christolini in odd years.
Memorial Day shall be Mr. Christolini's in even years, Mrs. Christolini's in odd years. And that shall be ten to seven.
Labor Day, Fourth of July, ten to seven, same schedule, father has Labor Day in odd years, mother in even years. Fourth of July dad has even number years, mom in odd years. CT Page 5085-ju
Now, the record was not clear to the court whether the children have one break in February and April, in other words, they don't have February and April but they have like one in March or whether it's going to change over time. So, what I'm going to do is make you orders for both so that if the school schedule changes you know what to do with either. Okay?
Assuming that it's only one break currently, that they don't get the double break that some school districts get, then Mr. Christolini shall have the children in even number years from December 26th through January 1st and then in odd years he'll have the winter, I'm going to call it the winter school vacation if it's in February, March or April. Okay?
And then that flips so that Mrs. Christolini shall have in even number years the winter vacation whether it's in February, March or April and in odd years she'll have December 26th through January 1st
Now, if the school schedule changes so that there's two breaks, one in February and one in April, then Mr. Christolini shall have February break yearly, Mrs. Christolini shall have April break yearly and Mr. Christolini will have December 26th through December 28th in odd years and December 28th through January in even years with the flip for Mrs. Christolini shall have December 26th through December 28th in even years and December 28th through January 1St in odd years.
Summers. Each party shall have two weeks uninterrupted time with the children each summer, non-contiguously; in other words, the two weeks are not to be taken together. Mr. Christolini shall give Mrs. Christolini, by April 15th, notice of when he's going to take those. However, this year it's going to be by May 15th and he's to give her notice in writing.
Mrs. Christolini is to give Mr. Christolini a notice of her two weeks by June 15th. This provides for a hiatus in between his notice and her notice to him for scheduling any summer activities for the children and then to provide him the schedule as it may exist.
Neither party, it's quite clear, the court shouldn't have to say it but the court orders neither party is to make disparaging comments to the children about the other.
Now, pursuant to my warning yesterday, I'm going to change it by an hour because I'm running late, the defendant, Mr. Christolini, is ordered to personally vacate the marital home by seven p.m. tonight. Mrs. Christolini shall provide him opportunities thereafter, first to retrieve CT Page 5085-jv his personal belongings and clothing within forty-eight hours at a time that the children shall not be present. And then thereafter, with seven days' notice from Mr. Christolini, to retrieve the bulkier items that are on the list and the children are not to be present for that.
Now, I cannot tell you what to say to your children tonight but it would be my best suggestion to you that you go there jointly, I know you probably didn't drive up together, and simply tell the children that it's time for one of the paients to move out and that Mr. Christolini's moving out and that they will see Mr. Christolini on a regular sustained basis. They don't need to know anything else, that's all they need to know. And if Mr. Christolini knows where he's going he can tell them so that they have the assurance of where he's going. Anything more than that burdens them. Okay?
All right. The balance of the orders.
Mr. Christolini shall, within thirty days, quitclaim all of his right, title and interest into the marital home to Mrs. Christolini. She shall indemnify and hold him harmless on all expenses relating to the home. At the same time he shall quitclaim to her all of his right, title and interest into the back lot.
The court recomputed the child support and utilized the nine hundred and thirty gross for Mr. Christolini and eighty dollars per week for the rental rather than the sum urged by Mrs. Christolini. And on that recalculation, counsel, it provides that the presumptive child support to be paid by Mr. Christolini to Mrs. Christolini is two hundred and seventy-four dollars and nineteen cents and the court sees no reason to vary from that and that, therefore, is the order of child support. Pursuant to federal law that is by immediate wage withholding and although Mr. Christolini may want to leave here right away, Mr. Ginzberg, he needs to sign an Advisement of Rights before he leaves the building. If you want to find one either from. Mr. Carey or on the second floor and then deliver it after he leaves, that would be fine.
Mr. Christolini will maintain health insurance for the benefit of the minor children as it's available through his employment and these child support calculations have contemplated that.
The guidelines provide after these recalculations that Mr. Christolini will pay forty-eight percent and Mrs. Christolini fifty-two percent of the unreimbursed health expenditures. First of all the guidelines provide that Mrs. Christolini will pay the first one hundred dollars per year per CT Page 5085-jw child and then these percentages kick in. Thereafter, the health expenditures that are to be split on this basis is to be broadly construed to include medical, dental, optical, in other words, eye doctor, eyeglasses, if the children wear contacts, contacts; if the children go to the dentist, if the children need braces, orthodontist, if they need teeth extractions, dental surgeons, all the normal and customary needs of children medically. I don't expect there's a problem but it's usually easier to describe it at length. It includes prescriptive care.
Mr. Christolini shall pay Mrs. Christolini periodic alimony in the amount of sixty dollars per week for a period of ten years unless sooner terminated by the plaintiff's remarriage or either party's death. If Ms. Christolini cohabits, as defined by statute and case law, then it will be subject to modification as provided for by statute and case law. This order is non-modifiable as to term.
Each party is to maintain the life insurance, as they have it available to them through their employment presently, in equal shares for the four minor children until the children are no longer minors or reach nineteen and have not finished high school or that have graduated from high school. Basically, the child support rules, counsel.
The court orders the following dependency exemptions. Mr. Christolini shall be entitled to take the oldest and youngest child as a dependency exemption as long as he is entitled to do so as a matter of federal law and so long as he is current in his child support for the year that he seeks to take the dependency exemptions on December 31.
As to the balance of the assets, Mr. Christolini is the sole owner of his property at Main Street free of any claim from Mrs. Christolini. He is the sole owner of his Federal Credit Union account, all of the cash on hand of forty-six thousand one ninety-two and seventy-nine hundred subject to the claim of course of his partner in that. And he is the sole owner of his Fidelity Annuities, Fidelity IRA, his Raytheon — his Raytheon pension, his Perkin-Elmer pension, the Town Car, the Buick LeSabre.
Mrs. Christolini is the sole owner of her pension plan at SNET, — her TRASOP, her B-U-R-S-P plan, the Chevrolet Venture, her First Union checking and her telephone Federal Credit Union.
The parties are required to sign any documents necessary to result in the transfer of any accounts that are held jointly that the court is CT Page 5085-jx segregating to sole ownership.
The court accepts the stipulation in regard to the UGMA accounts which are technically not UGMA accounts anymore because the statute's been supplanted but the court will accept that and makes it orders of the court.
The stipulation in regard to personal property also constitutes orders of the court and the list of disputed tems the court refers, if the parties cannot agree, to Family Relations for a binding arbitration without recourse to the court.
These orders on the division of the assets contemplate and acknowledge Mr. Christolini's premarital contributions and his attainment of assets through his mother's passing and the malpractice action.
The court further orders lump sum alimony to be paid by Mr. Christolini to Ms. Christolini in the amount of sixteen thousand dollars to be paid within thirty days of today's date.
The court orders that Mr. Christolini shall pay the entire bill for the attorney for the minor children and the GAL and that each party shall pay their own counsel fees. To order otherwise in regard to these respective bills would do damage to the financial mosaic that the court has created by these orders and the court has considered the parties' respective liquidity and ability to pay their bills and satisfy their other obligations herein and the court is also mindful that Mr. Christolini will be required to procure alternative housing and in all likelihood would be utilizing funds to purchase housing. And all of that has been contemplated in these orders and it would be appropriate for him to do so if he would choose to do so since the children will be with him from time to time at his home.
Counsel, do you think I missed anything?
ATTY. GIULIANO: No, Your Honor.
ATTY. GINZBERG: I have one question.
THE COURT: Feel free.
ATTY. GINZBERG: Actually, maybe two questions.
THE COURT: Go ahead. CT Page 5085-jy
ATTY. GINZBERG: Your Honor, did you leave out the fact that Mr. Christolini's father gave the parties a gift of thirty-five hundred for the purchase of the marital home?
THE COURT: I was totally aware of that.
ATTY. GINZBERG: Okay. And, lastly, was Your Honor aware that Mr. Christolini's interest in the partnership building was a hundred and two thousand not two hundred and four thousand?
THE COURT: Yes, but I'm constrained to find value of property and I accept, however, and I'm aware, I referred to Mario, that his interest is half of that and the court computed it at that rate.
ATTY. GINZBERG: Thank you.
THE COURT: And also that his interest in the proceeds is half; in other words, the rental proceeds, both the asset and the rental proceeds. The court's very aware of that. Thank you.
ATTY. GINZBERG: My question was just that when you —
THE COURT: Right.
ATTY. GINZBERG: — computed all the assets —
THE COURT: Right.
ATTY. GINZBERG: — you used a hundred and two —
THE COURT: Oh, absolutely.
ATTY. GINZBERG: — thousand rather than —
THE COURT: Absolutely. I just have to find fair market value of assets.
ATTY. GINZBERG: Thank you for that clarification.
ATTY. GIULIANO: Your Honor, Ms. Christolini is asking me to make the court be aware, in regard to the children's vacation, they have one week in April but they have long weekends for Lincoln's Birthday and Washington's Birthday in February. CT Page 5085-jz
THE COURT: Okay. Mr. Christolini had let me know it was one weekend as I was going. I mean one week, he had put up a finger.
ATTY. GIULIANO: Oh, okay.
THE COURT: My problem is that, A, it wasn't in evidence and, B, school calendars change and I wanted to allow for it. I am aware that there are long weekends that don't include Memorial Day and I have indicated by the orders that if they fall on Mr. Christolini's weekend, then if he can make the arrangements to take the Monday off, that's appropriate.
Now, those orders of Mr. Christolini's access or visitation with the children do not, as you figure out how to get along after this, folks, prevent you from developing flexibility with each other over time. Usually trust is rebuilt in little pieces and not all at once but with four kids, the ages you have them, you're probably going to have to do it because they're going to be going in a thousand different directions ultimately and there's going to have to be a level of cooperation rebuilt or they're going to suffer.
Counsel, thank you for your attendance, your work, and the parties, I wish you luck. Thank you.